UNITED STATES FIRE INSURANCE
COMPANY, Plaintiff,

v.

DEERING MANAGEMENT GROUP, INC.
d/b/a Casterline Management Group,
Inc., Kiest Associates Ltd. d/b/a Wendy's
Restaurant and Mary Ann Ybarra, De-
fendant.

Civil Action No. 3:94–CV–1760–P.

United States District Court,
N.D. Texas,
Dallas Division.

Aug. 13, 1996.

Charles Thomas Frazier, Jr., Mary Erlene Reyes, William D. Cobb, Jr., Veronica Martinsen Bates, Cowles & Thompson, Dallas, TX, for plaintiff U.S. Fire Insurance Co.

Cecil W. Casterline, Stalcup & Casterline, Dallas, TX, for defendants Deering Management Group Inc., Kiest Associates Ltd.

Manuel Rios, Law Office of John M. Lozano, Dallas, TX, for defendant Mary Ann Ybarra.

### AMENDED MEMORANDUM OPINION AND ORDER

SOLIS, District Judge.

Now before the Court are:

1. Plaintiff's Motion for Final Summary Judgment and Brief in Support Thereof, filed February 15, 1995;

2. Plaintiff's Supplemental Motion for Final Summary Judgment and Brief in Support Thereof, filed October 13, 1995;

3. Defendant Mary Ann Ybarra's Response Brief to Plaintiff's Supplemental Motion for Final Summary Judgment, filed November 2, 1995;

4. Plaintiff's Reply to Defendant Mary Ann Ybarra's Response Brief to Plaintiff's Supplemental Motion for Final Summary Judgment, filed November 21, 1995;

5. Defendant Mary Ann Ybarra's Motion for Summary Judgment and Brief in Support Thereof, filed October 13, 1995;

6. Plaintiff's Response to Defendant Mary Ann Ybarra's Motion for Summary Judgment and Brief in Support Thereof, filed November 2, 1995;

7. Defendant Mary Ann Ybarra's Motion to Strike Plaintiff's Response to Defendant Ybarra's Motion for Summary Judgment and Brief in Support Thereof, filed November 28, 1995;

8. Plaintiff's Response to Defendant Mary Ann Ybarra's Motion to Strike Plaintiff's Response to Defendant Mary Ann Ybarra's Motion for Summary Judgment and Brief in Support Thereof, filed December 4, 1995;

9. Defendant Mary Ann Ybarra's Motion to Strike Plaintiff's Reply to Defendant Mary Ann Ybarra's Response Brief to Plaintiff's Supplemental Motion for Final Summary Judgment, filed December 4, 1995;

10. Plaintiff's Response to Defendant Mary Ann Ybarra's Motion to Strike Plaintiff's Reply to Defendant Mary Ann Ybarra's Response Brief to Plaintiff's Supplemental Motion for Final Summary Judgment, filed December 5, 1995.

### BACKGROUND AND PROCEDURAL HISTORY

On March 13, 1991, Defendant Mary Ann Ybarra ("Ybarra") was sexually assaulted on the premises of a Wendy's restaurant. Ybar-

ra was an employee of Wendy's. Subsequently, Ybarra brought a state-court suit against Wendy's International Corporation ("Wendy's"), the franchisor; Deering Management Group, Inc. d/b/a Casterline Management Group, Inc. ("Casterline")[1], the franchisee-operator; Kiest Associates, Ltd. ("Kiest, Ltd."), the owner of the premises; and Defenders Services, Inc. ("Defenders"), a security firm.

Before trial, Ybarra settled with Wendy's and Defenders for a total sum of $510,000 and thus dismissed them from the lawsuit. In the lawsuit that remained, Ybarra alleged that Casterline and Kiest knew of previous thefts and assaults on the premises and owed Ybarra a duty to provide her with a safe work environment. Specifically, Ybarra alleged that Casterline and Kiest were negligent in (1) failing to provide a reasonably safe work place, (2) failing to provide adequate security, (3) failing to develop and implement safety policies, (4) exposing Ybarra to unreasonably dangerous, unsafe, or hazardous conditions, and (5) failing to warn Ybarra of dangers around the Wendy's premises. Ybarra prevailed and received a judgment against Casterline and Kiest for $316,476.

Casterline was the named insured under a commercial general liability policy issued by U.S. Fire. Therefore, Plaintiff U.S. Fire Insurance Company ("U.S. Fire") provided the defense for Casterline and Kiest in the underlying state-court action pursuant to a reservation of rights. Accordingly, during the pendency of the state-court action, U.S. Fire filed this declaratory judgment action seeking a declaration that it had no duty to defend and/or indemnify Casterline and Kiest under such policy. Both U.S. Fire and Ybarra have moved for summary judgment.

U.S. Fire argues that it had no duty to defend and/or indemnify Casterline or Kiest with respect to Ybarra's state-court action. In support of its position, U.S. Fire argues (1) that Kiest was not an insured under the policy; (2) that collateral estoppel does not preclude it from relitigating the issue of

whether Ybarra was within the course and scope of her employment at the time of the incident; (3) that Ybarra lacks standing to argue that U.S. Fire has somehow waived its defenses as to Kiest or that U.S. Fire is somehow estopped from asserting policy defenses against Casterline and Kiest; and (4) that Ybarra's claim came within a policy provision excluding coverage for injuries to employees in the course and scope of their employment (the "employment exclusion").

Ybarra, on the other hand, counters that U.S. Fire was in fact responsible for defending and indemnifying both Casterline and Kiest. In support of her position, Ybarra contends (1) that Kiest, while not a named insured, was an additional insured under the policy; (2) that because U.S. Fire allegedly assumed the defense of Kiest without a reservation of rights, U.S. Fire waived all policy defenses against Kiest; (3) that U.S. Fire has so prejudiced Defendants that it is therefore estopped from denying coverage; (4) that U.S. Fire is collaterally estopped from arguing that Ybarra's claim comes within the course-of-employment exclusion; (5) that even if collateral estoppel doesn't apply, Ybarra's claim does not come within the employment exclusion.

Because the issues at dispute in this action are common to both Ybarra's and U.S. Fire's motions for summary judgment, the Court will not independently analyze each motion; rather, the Court will consider both motions together and structure its analysis around the common issues.

### MOTIONS TO STRIKE

■ Before reaching the cross-motions for summary judgment, the Court will consider two motions to strike filed by Ybarra. First, Ybarra moves to strike U.S. Fire's Response to Ybarra's Motion for Summary Judgment on the ground that such 26–page response brief violates Local Rule 5.3(c) of the Northern District of Texas, which requires that no reply brief exceed 10 pages. Specifically, Rule 5.3(c) provides that "[e]xcept by permis-

---

1. Casterline is the successor in interest to DMG–KEJAY Joint Venture and as such is the named insured under the policy at issue in this case.

sion of the presiding judge, no brief shall exceed 25 pages in length ..., and no reply brief shall exceed ten (10) pages (Rule 5.1(f))." Therefore, Ybarra essentially argues that the Local Rules make no distinction between response and reply briefs for purposes of page length.

U.S. Fire, on the other hand, argues that the Local Rules do indeed distinguish between responses and replies. *Compare* Local Rule 5.1(e) (stating that a response must be filed within 20 days from the date the motion was filed) *with* Local Rule 5.1(f) (stating that a reply must be filed within 15 days of the filing of a response). While the Local Rules do not specifically distinguish between a response and a reply for purposes of page length, the Court holds that the better view is that such a distinction does indeed exist.

Under Rule 5.3(c), a party filing a motion and corresponding reply has a total of 35 pages of briefing within which to make its case. However, a party opposing such motion and reply has only the pages allotted to the response within which to refute the allegations set out in the motion and reply. Thus, it seems hardly fair that the party opposing the motion be given only 10 pages within which to do so.

This inequity is even more apparent with respect to motions for summary judgment. Parties moving for summary judgment often list several pages of "undisputed facts" that are not truly undisputed. Therefore, the party opposing such motion must often use nearly six to eight pages just to put such facts into dispute. Thus, it hardly seems fair to allow only two to four additional pages of response to rebut movant's case. Accordingly, the only reasonable construction of Local Rule 5.3(c) is to interpret the 25–page limit imposed upon "briefs" to apply to briefs in support of both motions and responses. Therefore, Ybarra's motion to strike U.S. Fire's response is DENIED.

Second, Ybarra moves to strike U.S. Fire's Reply to Ybarra's Response to U.S. Fire's Supplemental Motion for Summary Judgment. Based on the same faulty assumption about Local Rule 5.1(c) discussed above, Ybarra argues that it would be unfair to allow U.S. Fire an additional 9–page reply given that U.S. Fire had already filed a 22–page Motion for Summary Judgment and a 10–page Supplemental Motion for Summary Judgment. Furthermore, Ybarra argues this would be especially unfair given that Ybarra followed the supposed 10–page limitation in responding to *both* U.S. Fire's motion for summary judgment and its supplemental motion for summary judgment.

As already stated, the Local Rules do not limit responses to 10 pages. Furthermore, Ybarra did not respond to *both* U.S. Fire's motion for summary judgment and its supplemental motion for summary judgment. Rather, Ybarra filed no response to U.S. Fire's motion for summary judgment, but filed a response only to U.S. Fire's supplemental motion for summary judgment. Finally, U.S. Fire was within its rights under the Local Rule 5.3(c) in filing a 10–page reply to its supplemental motion. Accordingly, Ybarra's motion to strike U.S. Fire's reply to its supplemental motion for summary judgment is DENIED.

## CROSS–MOTIONS FOR SUMMARY JUDGMENT

### SUMMARY JUDGMENT STANDARD

Summary judgment shall be rendered when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25, 106 S.Ct. 2548, 2552–54, 91 L.Ed.2d 265 (1986); *Thomas v. Harris County,* 784 F.2d 648, 651 (5th Cir.1986). All evidence and the inferences to be drawn therefrom must be viewed in the light most favorable to the party opposing the motion. *Marshall v. Victoria Transp. Co.,* 603 F.2d 1122, 1123 (5th Cir.1979). The party defending against a motion for summary judgment cannot defeat the motion unless he provides specific facts that show that the case presents a genuine issue of material fact, such that a jury might return a verdict in his favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256–57, 106 S.Ct. 2505, 2514–15, 91 L.Ed.2d 202 (1986).

Once the moving party has made an initial showing, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986). Mere assertions of a factual dispute unsupported by probative evidence will not prevent summary judgment. *Anderson*, 477 U.S. at 248–50, 106 S.Ct. at 2510–11; *Abbott v. Equity Group Inc.*, 2 F.3d 613, 619 (5th Cir.1993). In other words, conclusory statements unsupported by evidentiary facts will not suffice to defeat a motion for summary judgment. *Falls Riverway Realty, Inc. v. Niagara Falls*, 754 F.2d 49 (2d Cir.1985). If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to his case and on which he will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53.

The Court has no duty to search the record for triable issues. *Guarino v. Brookfield Township Trustees*, 980 F.2d 399, 403 (6th Cir.1992). The Court need only rely on the portions of submitted documents to which the nonmoving party directs. *Id.*

## ANALYSIS

### I. *Prejudice and Estoppel*

■ Ybarra argues that U.S. Fire prejudiced Kiest, Ltd. and Casterline in the underlying state-court action when their counsel (hired by U.S. Fire) failed to request the dollar credit most favorable to the parties. Accordingly, Ybarra argues that U.S. Fire is estopped from asserting any policy defenses against either Kiest, Ltd. or Casterline because U.S. Fire did not provide those parties an adequate defense in the underlying state-court action. Ybarra further argues that she has standing to assert such estoppel in her capacity as a judgment creditor of the insured. U.S. Fire, on the other hand, argues that Ybarra in fact lacks standing to assert such estoppel.

In support of her claim that she has standing, Ybarra cites *Chaffin v. Transamerica Ins. Co.*, 731 S.W.2d 728 (Tex.Civ.App.—Houston [14th Dist.] 1987, reh. den.). *Chaffin* involved a suit by contractors against their subcontractor's insurer for tortious handling of contractors' property damage claim against subcontractor. *Id.* at 730. Specifically, contractors alleged, *inter alia*, that subcontractor's insurer breached its duty of good faith and fair dealing to subcontractor by denying, without investigation, coverage of contractors' claim against subcontractor. *Id.* In finding that the contractors lacked standing to sue, the *Chaffin* court stated that Texas courts have not "broadened an insurance carrier's duty of good faith and fair dealing to provide a remedy to an injured third party." *Id.* at 732. In the only language even remotely favorable to Ybarra's position, the *Chaffin* court stated in dicta that a judgment creditor might have standing to bring a direct action against the insurer, but that such action would be limited to the amount of the policy.

The *Chaffin* court's recognition of the possibility that a judgment creditor might have a right to bring a direct action against an insurer does not help Ybarra here. First, the contractors in *Chaffin* were not judgment creditors of the insured. *Id.* at 730 (noting that contractors' suit against subcontractor was dismissed and was thus never reduced to judgment). Thus, the court's statement about the possibility of standing of judgment creditors was purely dictum. Furthermore, the statement was made without any indication of what kind of action, if any, a judgment creditor may have standing to bring. Thus, it is not apparent whether or not the court meant that a judgment creditor could have standing to bring only contractual claims or whether such person could also bring extra-contractual, tort claims as well. However, the court most likely meant the former given its citation to *Becker v. Allstate Ins. Co.*, 678 S.W.2d 561, 561–62 (Tex.App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.) (holding that a judgment creditor did not have standing to bring a "*Stowers* action"[2] against the

---

**2.** A "*Stowers* action" is one in which an insured sues its insurer for negligent failure to settle

within policy limits. *See G.A. Stowers Furniture*

judgment debtor's insurer). Furthermore, in the context of a case involving a judgment creditor, the *Chaffin* case was cited in support of a finding of no standing. *See P.G. Bell Co. v. United States Fidelity and Guaranty Co.*, 853 S.W.2d 187, 190 (Tex.App.— Corpus Christi 1993, no writ) (citing *Chaffin* in support of its holding that a contractor did not have standing to bring a suit for bad faith against a subcontractor's insurer). Therefore, *Chaffin* appears to cut against Ybarra's position.

█ Admittedly, there is no Texas case that directly holds that a judgment creditor lacks standing to assert that an insurer should be estopped from denying coverage because it tortiously handled its insured's defense. However, such conclusion seems the most reasonable in light of the case law available. In cases involving claims for damages in excess of policy limits, the law is sufficiently clear that a judgment creditor, without an assignment of rights, has no standing to bring a direct action against the insurer for damages arising from the extracontractual, tortious handling of the insured's defense. *See P.G. Bell Co. v. United States Fidelity and Guaranty Company*, 853 S.W.2d 187, 190 (Tex.App.—Corpus Christi 1993, no writ) (stating that "only the insured has standing to sue its insurance carrier for what is essentially a breach of the duty of good faith and fair dealing when handling the claim filed against the insured"); *Samford v. Allstate Insurance Company*, 529 S.W.2d 84 (Tex.Civ.App.—Corpus Christi 1975, writ ref'd n.r.e.) (citing *Cook v. Superior Ins. Co.*, 476 S.W.2d 363 (Tex.Civ.App.—Beaumont 1972, writ ref'd n.r.e.) for the proposition that a *"Stowers"* action lies in tort and as such is intended to repair harm to the insured, not a third party).

The fact that the instant case does not involve a claim for damages in excess of the policy limits does not alter the applicability of the above cases. Regardless of whether a judgment creditor seeks damages in excess of the policy limits based on allegations of bad faith or seeks to estop the insurer from denying damages "within policy limits" based on allegations of bad faith, in both

*Co. v. American Indemnity Co.*, 15 S.W.2d 544

instances a judgment creditor seeks damages without regard to coverage (i.e., the judgment creditor seeks extracontractual damages). Therefore, the common question is whether a judgment creditor has standing to bring extracontractual claims based on an insurer's tortious handling of the judgment debtor's defense. It is apparent from the cases discussed above, that the answer is appropriately no. For as pointed out in *Samford*, it is counterintuitive, without an assignment of rights at least, to allow a judgment creditor who benefitted from the insurer's alleged misconduct to collect extracontractual damages based on that conduct. In this case, it makes no sense to allow Ybarra to recover for U.S. Fire's alleged mishandling of Casterline's case when Ybarra would have received a take nothing judgment had there been no alleged mishandling. If anyone was injured by defense counsel's decision not to elect the most favorable credit, it was Casterline, not Ybarra. Accordingly, Ybarra does not have standing to seek damages based on prejudice and estoppel.

## II. *Kiest Associates, Ltd.*

U.S. Fire contends that it had no duty to defend and/or indemnify Kiest, Ltd. because Kiest, Ltd. was not an insured under the policy. It is undisputed that Kiest, Ltd. was not a named insured. Therefore, Kiest, Ltd. was covered only if it qualified as additional insured under Section II of the policy.

Section II is entitled "Who Is An Insured" and provides:

1. If you are designated in the Declarations as:

   . . . .

   b. A partnership or joint venture, you [referring to Casterline] are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

   . . . .

2. Each of the following is also an insured:

(Tex. Comm'n App.1929, holding approved).

. . . .

b. Any person (other than your employee) or any organization while acting as your real estate manager.

. . . .

4. Any organization you newly acquire or form, other than a partnership or joint venture, and over which you maintain ownership or majority interest, will be deemed to be a Named Insured if there is no other similar insurance available to that organization.

In order to analyze this issue, the organizational structure of the entities involved must be understood. Kiest, Ltd., a defendant in this declaratory judgment action, was the owner and landlord of the property in question. Casterline was the lessee of that property and the franchisee that operated a Wendy's restaurant on the property. In addition, Kiest, Ltd. was a limited partnership in which Kiest Associates, Inc. (a separate entity from Kiest, Ltd.) served as the general partner. Kiest Associates, Inc. was the wholly owned subsidiary of Casterline.

### A. *Member or Partner Provision*

■ Based on the above organizational structure, Ybarra argues that Kiest Associates, Inc., and therefore Casterline, controlled the operations of Kiest, Ltd. Thus, Ybarra argues that Kiest, Ltd. was an insured pursuant to Section II.1.b as a member or partner of Casterline. In effect, Ybarra contends that Casterline stepped into the shoes of its wholly owned subsidiary, Kiest Associates, Inc., so that Casterline and Kiest, Ltd. were partners under the policy. However, the law does not allow for such a construction.

" 'Notwithstanding the fact that a parent corporation owns the entire capital stock of the subsidiary corporation, the two corporations are separate legal entities, and, whatever may have been the motive leading to their separate existence, they can only be regarded as separate entities for the purpose of legal proceedings." *Metropolitan Life Insurance Co. v. La Mansion Hotels & Resorts, Ltd.*, 762 S.W.2d 646, 652 (Tex.App.—

San Antonio 1988) (quoting *Rimes v. Club Corporation of America*, 542 S.W.2d 909 (Tex.Civ.App.—Dallas 1976, writ ref'd n.r.e.)). Furthermore, Ybarra alleges no theories (e.g., alter ego) for taking exception with the rule.

Moreover, as pointed out by U.S. Fire, to construe Section II.1.b in the manner suggested by Ybarra would be directly contrary to the more applicable language of Section II.4. Section II.4 provides that an organization that the named insured acquired or formed and over which the named insured maintained ownership or majority interest, *other than a partnership or joint venture*, would also be deemed a named insured. Thus, Section II.4 specifically excepts the situation presented in the case at bar in which the named insured maintained a majority interest in a limited partnership.

### B. *Real Estate Manager Provision*

■ Next, Ybarra argues that Kiest, Ltd. also qualifies as an insured under Section II.2.b., which provides for coverage of the real estate manager of the named insured. As already stated, Kiest, Ltd. was the owner and lessor of the property in question, and Casterline was the lessee. Absent any evidence that something more than a typical lessor-lessee relationship existed between Kiest, Ltd. and Casterline, their relationship on its face will not support the inference that the landlord served as the real estate manager for the lessee. Ybarra offers absolutely no summary judgment evidence in support of such an argument.

### C. *Alleged Failure to Reserve Rights*

Finally, Ybarra contends that because U.S. Fire allegedly assumed the defense of Kiest, Ltd. without first obtaining a reservation of rights, U.S. Fire has waived its right to assert any policy defenses against Kiest, Ltd. Without deciding whether Ybarra has standing to raise such an argument, Ybarra's argument nonetheless fails.

U.S. Fire did in fact obtain a reservation of rights before assuming the defense of Kiest, Ltd. In a letter sent certified mail with return receipt requested that was delivered to counsel for Kiest, Ltd. on October 12,

1993, U.S. Fire agreed to provide Kiest, Ltd. a defense pursuant to a reservation of rights. It was not until November 23, 1993, after issuance of the reservation of rights letter, that the state court issued an order substituting counsel hired by U.S. Fire for counsel formerly retained by Kiest, Ltd. Thus, U.S. Fire waived no policy defenses with respect to Kiest, Ltd. Accordingly, as a matter of law, Kiest, Ltd. was not an insured under the policy. Therefore, U.S. Fire had no duty to defend or indemnify Kiest, Ltd, and thus the Court hereby GRANTS summary judgment in favor of U.S. Fire with respect to coverage of any claims against Kiest, Ltd.

### III. *Casterline Management Group, Inc.*

U.S. Fire contends that it had no duty to defend or indemnify Casterline because of application of the employment exclusion, which excludes coverage for bodily injuries received by employees arising out of [3] and in the course of their employment. However, Ybarra claims that U.S. Fire is collaterally estopped from asserting such a claim because the state court found in the underlying action that Ybarra was not within the course and scope of her employment. *See* (Pl.'s Supp. Mot. for Final Summ.J.Ex. I at 7). In the alternative, Ybarra argues that even if she was injured while within the course and scope of her employment, the incident was nonetheless covered under the insured contract provision of the policy.

### A. *Collateral Estoppel*

■ Collateral estoppel operates to preclude a party from relitigating any ultimate issue of fact that was actually litigated and essential to the judgment in the prior suit. *See Employer's Casualty Co. v. Block,* 744 S.W.2d 940, 942 (Tex.1988); *Bonniwell v. Beech Aircraft Corp.,* 663 S.W.2d 816, 818 (Tex.1984). In order for collateral estoppel to apply, the challenged finding must have

been essential to the judgment in the prior suit and privity must have existed between the parties. *Block,* 744 S.W.2d at 943. In this case, the privity question asks whether U.S. Fire and Casterline were in privity in the underlying state-court action. This Court will address (1) whether the state-court finding on the course and scope issue was essential to the judgment, (2) whether the course and scope issue was actually litigated, and (3) whether U.S. Fire and its insured were in privity, in that order.

■ Thus, the first question is whether determination of the course and scope issue was essential to the judgment in the underlying action. Ybarra argues that such determination was essential to the underlying judgment given that Casterline, U.S. Fire's privy, raised the defense of comparative negligence. (*See* Def. Mary Ann Ybarra's Mot. for Summ.J.Ex. 8 at 2). Under Texas law, the defense of comparative fault is not available when a plaintiff was within the course and scope of her employment at the time of the incident. *See* Tex.Lab.Code Ann. § 406.033. Therefore, Ybarra contends that by raising such a defense, Casterline placed in issue the question of whether or not Ybarra was within the course and scope of her employment at the time of the incident. Moreover, as further evidence of the state court's consideration of such issue, Ybarra points to testimony from the underlying action concerning whether Ybarra's own negligence, or the negligence of Casterline, was the proximate cause of her injuries. *See* (Pl.'s Supp.Mot. for Final Summ.J.Ex.G at 113, 115–17). U.S. Fire, on the other hand, offers no argument as to why comparative negligence does not place the course and scope question in issue, but simply asserts that the finding was not essential to the judgment. Because the state court had to determine the applicability of the comparative negligence defense, this Court finds that

---

**3.** As pointed out above, the employment exclusion excludes coverage for bodily injuries to employees arising out of *and* in the course of their employment. *See* (Def. Mary Ann Ybarra's Motion for Summ.J.Ex. 3). Therefore, in order for the exclusion to apply, both conditions must be met (i.e., the injury must arise out of and be sustained in the course of employment). The

parties do not present arguments as to the "arising out of" element, but rather focus only on the "course of employment" element. Because the parties do not brief the "arising out of" element and because other issues are left for trial, the Court will defer ruling on satisfaction of that element until after trial.

the state court's finding as to the course and scope issue was essential to the judgment.

With regard to whether the course and scope issue was actually litigated, Ybarra points to testimony from the underlying lawsuit that Ybarra waited for security for around forty-five minutes after clocking out before exiting the building to the parking lot. *See* (Pl.'s Supp.Mot. for Final Summ.J.Ex.G at 47) (direct examination of Alma Addison); (Pl.'s Supp.Mot. for Final Summ.J.Ex.G at 56, 59) (cross-examination of Alma Addison). U.S. Fire, on the other hand, argues that even if the course and scope issue was raised, the precise and distinct issue of whether Ybarra was in the course and scope for coverage purposes was not litigated at all and thus that issue was not actually litigated for collateral estoppel purposes.

While the course and scope issue decided in the underlying action appears identical to the course and scope issue in this declaratory judgment action, this Court nevertheless finds that the issue was not "actually litigated." In order to have been actually litigated, U.S. Fire's alleged privy, Casterline, would have had to have taken a position in the underlying action consistent with U.S. Fire's interests. However, such was not the case here. In this declaratory judgment action, U.S. Fire seeks to show that Ybarra was not within the course and scope of her employment at the time of the incident. However, Casterline took the opposite position in the underlying action in order to take advantage of the comparative negligence defense. Thus, it was left to Ybarra to argue in the underlying action that she was within the course and scope of her employment. And clearly, U.S. Fire was not in privity with Ybarra and thus cannot be said to have had its interest on this issue adequately represented. Furthermore, from the state-court transcript it is apparent that Ybarra chose not to argue against a finding that she was outside the course and scope of her employment, given that in the underlying action Ybarra herself elicited testimony from one of her witnesses indicating that Ybarra was outside the course and scope of her employment. *See* (Pl.'s Supp.Mot. for Final Summ.J.Ex.G at 47) (direct examination testimony of Alma Addison that Ybarra waited at least forty-five minutes after clocking out before leaving the building). This decision by Ybarra not to oppose a finding that she was outside the course and scope of her employment probably represented a strategy choice by Ybarra to take her chances on the contributory negligence issue in order to later take advantage of the course and scope finding for purposes of coverage. Under such circumstances, the course and scope issue was not actually litigated.

The final question is whether U.S. Fire and its insured were in privity. Ybarra argues that U.S. Fire is barred from denying privity because U.S. Fire failed to immediately advise its insured of the fact that a conflict over coverage existed. Even though U.S. Fire issued reservation of rights letters, Ybarra argues that such letters did not fully inform Casterline of the conflict, citing *Employers Casualty Co. v. Tilley*, 496 S.W.2d 552 (Tex.1973) in support of her argument. Furthermore, Ybarra argues that because of their contractual relationship via the insurance policy they were therefore in privity. And finally, Ybarra contends that pursuant to a line of Texas cases, U.S. Fire's "open and active participation" in the defense of Casterline has the legal effect of creating privity.

This Court is unpersuaded. U.S. Fire issued a series of reservation of rights letters to Casterline, the first one delivered on May 20, 1993. *See* (Pl.'s Resp. to Def. Mary Ann Ybarra's Mot. for Summ.J.Ex. 7(a) at 3). On June 2, 1993, the state court issued an order allowing Casterline to substitute its original counsel with those provided by U.S. Fire. *See* (Def. Mary Ann Ybarra's Mot. for Summ. J.Ex. 6). Therefore, U.S. Fire "immediately" informed Casterline of the conflict given that it set out such conflict in its reservation of rights letter issued *before* the counsel chosen by U.S. Fire ever took over Casterline's defense.

Furthermore, the reservation of rights letter also clearly provided Casterline with adequate information about the substance of the conflict. Specifically, the May 20, 1993 letter clearly sets out the employment exclusion and states that should it be determined that

Ybarra was within the course and scope of her employment that no coverage would be available. *See* (Pl.'s Resp. to Def. Mary Ann Ybarra's Mot. for Summ.J.Ex. 7(a) at 3).

Finally, *Tilley* is clearly inapposite as it is completely distinguishable from the case at bar. In *Tilley,* the court held that an insurer was estopped from denying coverage (1) because the insurer hired the same lawyer to both represent its interests on the coverage issue and represent its insured's interests in the underlying action and (2) because a non-waiver agreement obtained by the insurer did not advise the insured of the specific coverage conflict and did not authorize the insurer to use the same attorney to represent its and its insured's interests. In stark contrast, U.S. Fire did not retain the same lawyers to represent its interests and Casterline's interests, and the reservation of rights letters issued by U.S. Fire did specifically set out the alleged conflict. Therefore, U.S. Fire has done nothing under the reasoning of *Tilley* to warrant applying estoppel or finding privity.

Also, the fact that U.S. Fire and Casterline were involved in a contractual relationship does not mean that they were in privity. Under the facts of this case, the opposite is true. In cases, like the one at bar, in which an insurer and its insured were in conflict in the underlying action regarding coverage, the parties were held not to be in privity. *See Cluett v. Medical Protective Co.,* 829 S.W.2d 822, 826 (Tex.App. Dallas 1992, writ denied); *Columbia Mut. Ins. Co. v. Fiesta Mart, Inc.,* 987 F.2d 1124, 1128 (5th Cir. 1993). Moreover, the fact that U.S. Fire defended Casterline in the underlying suit pursuant to a reservation of rights further evidences the adversarial positions of U.S. Fire and Casterline regarding the course and scope issue.

Finally, Ybarra's argument that U.S. Fire's "open and active participation" in Casterline's defense had the legal effect of creating privity also fails. First, the cases Ybarra relies upon do not support her argument. *Gorelick v. Harrison County* was not an insurance case, but rather involved a suit for wrongful taking and damaging of property. 720 S.W.2d 835, 836 (Tex.App.—Texar-

kana 1986). Furthermore, the *Gorelick* court's finding of privity was predicated upon derivative liability, not open and active participation. *Id.* at .836. *Elliott v. Hamilton* was also not an insurance case, but rather involved an appeal from a judgment admitting a will to probate. 767 S.W.2d 262, 262 (Tex.App.—Beaumont 1989). Furthermore, the *Elliott* case had nothing to do with collateral estoppel or privity, but rather involved the issue of whether a court had jurisdiction to issue a judgment when the prevailing parties had no pleadings on file. *Id.* at 263. The *Elliott* court held that the lower court did indeed have such jurisdiction in situations in which "[p]ersons ... by their active and open participation, so connect themselves with the litigation to have the legal effect of making them a party." *Id.* at 263. Ybarra obviously developed its "active and open participation" theory based upon the *Elliott* case; however, as is apparent, the context within which that language was used does not support application to the collateral estoppel context. Finally, while *Kahla v. Traveler's Ins. Co.* was an insurance case in which the court held that the insurer was bound by collateral estoppel, the *Kahla* court's holding was predicated upon the fact that the insurer wrongfully refused to defend its insured. *Id.* 932–33. Therefore, *Kahla* has no application to this case in which U.S. Fire did indeed provide Casterline a defense.

Accordingly, while the state court's determination of the course and scope issue was essential to the judgment, because the issue was not actually litigated and because the parties were not in privity, the Court holds that collateral estoppel does not preclude U.S. Fire from relitigating the course and scope issue.

### B. *Duty to Defend and/or Indemnify*

Therefore, the Court must now determine whether a genuine issue of material fact exists as to whether or not U.S. Fire has a duty to defend and/or indemnify Casterline. In determining whether an insurer has a duty to defend· an insured, a court must look to the allegations in the plaintiff's petition. If such allegations may trigger a duty to indemnify, then the insurer has a duty to

defend. *Heyden Newport Chem. Corp. v. Southern Gen. Ins. Co.,* 387 S.W.2d 22, 25 (Tex.1965). The duty to defend arises even if the allegations are groundless, false or fraudulent. *Id.* And the court is not to look outside the petition in determining whether the duty applies, *Cullen/Frost Bank v. Commonwealth Lloyd's Ins. Co.,* 852 S.W.2d 252, 255 (Tex.App.—Dallas 1993, writ denied), but should evaluate the allegations in the petition in light of the policy provisions. *Texas United Ins. Co. v. Burt Ford Enterprises, Inc.,* 703 S.W.2d 828, 832 (Tex.App.—Tyler 1986, no writ). Furthermore, a court should evaluate the existence of a duty to defend by examining the latest, and only the latest amended petition. *Rhodes v. Chicago Ins. Co.,* 719 F.2d 116, 119 (5th Cir.1983). And, in determining the applicability of policy provisions, including exclusions, a court must focus on the origin of the damages, not the legal theory asserted for recovery. *Cullen/Frost Bank,* 852 S.W.2d at 255; *Continental Casualty Co. v. Hall,* 761 S.W.2d 54, 56 (Tex.App.—Houston [14th Dist.] 1988, writ denied). Finally, in declaratory judgment actions brought to determine coverage, Texas courts have considered extrinsic evidence in determining whether a duty to defend exists if the allegations in the underlying petition do not allege facts sufficient enough for a determination of whether those facts, even if true, are covered by the policy. *State Farm Fire & Casualty Co. v. Wade,* 827 S.W.2d 448, 453 (Tex.App.—Corpus Christi 1992, writ denied).

### 1. *Application of the Access Doctrine*

In this case, whether a genuine issue exists as to whether U.S. Fire has a duty to defend and/or indemnity Casterline turns on whether or not the employment exclusion applies.[4] However, on the facts of this case, in order to determining whether the employment exclusion applies, the Court must first determine whether the access doctrine applies in cases

not involving worker's compensation insurance.

▮▮▮▮ While the general rule is that employees injured while going to or from work are considered not within the course and scope of employment, *Texas Compensation Ins. Co. v. Matthews,* 519 S.W.2d 630, 631 (Tex.1974), in workers' compensation cases, Texas law does recognize an exception to this rule, known as the "access doctrine." Under this doctrine, an employee is considered to be within the course of employment if the injury occurred (1) within an area that the employer has indicated should be used as an access route and (2) within a reasonable margin of time and space necessary for passing to or from work *See Bordwine v. Texas Employers' Ins. Ass'n,* 761 S.W.2d 117, 119 (Tex.App.—Houston [14th Dist] 1988, writ denied). Furthermore, in cases in which an employee going to or from work is injured in a parking lot owned by the employer and at the place of employment, the rule is almost universal that the injury is considered to have occurred within the course and scope of employment. *See Texas Employers' Ins. Ass'n v. Dean,* 604 S.W.2d 346, 349 (Tex.Civ. App.—El Paso 1980, no writ).

Ybarra objects that the access doctrine does not apply in this case because it only applies in worker's compensation cases. U.S. Fire, on the other hand, argues that the access doctrine applies in both workers' compensation and employer's liability cases. However, in every case cited by either party, the court discussed the access doctrine only in the context of determining whether or not worker's compensation applied. Neither party cites the Court to any authority for the proposition that the access doctrine is or is not restricted to worker's compensation cases.[5] Thus, because the Court is left with making a policy decision as to the scope of the access doctrine, in making its determina-

---

4. The employment exclusion provides, in relevant part, that the policy does not cover damages for bodily injury to "[a]n employee of the insured arising out of and in the course of employment by the insured." *See* (Pl.'s Mot. for Final Summ.J. at 6) (quoting the employment exclusion).

5. While U.S. Fire does cite a treatise for the proposition that the employment clause is intended to exclude coverage in situations where worker's compensation or employer's liability would apply, U.S. Fire cites no authority for the proposition that the access doctrine should be expanded to employer's liability cases.

tion the Court desires to hear a more complete account of the facts surrounding the incident of this case. Therefore, this Court holds that the issue of whether the access doctrine applies in this case will be left for determination at trial.

### 2. Application of the Employment Exclusion

If the Court determines at trial that the access doctrine does not apply, then it is apparent from the general rule stated above that Ybarra was not within the course and scope of her employment and thus U.S. Fire would be bound to provide coverage. However, assuming *arguendo* that the access doctrine does apply, then the Court must determine whether the parking lot in this case constituted an access route.

■ Ybarra argues that it did not because Casterline had not designated the parking lot for use solely by employees. In support of her argument, Ybarra cites two cases that do stress the importance of a close relationship between the employer's premises and the access zone. *See Matthews,* 519 S.W.2d at 631–32; *Borderwine,* 761 S.W.2d at 119–20. However, those cases do not limit the access doctrine to areas restricted for use solely by employees. In *Matthews,* the court stated only that the access doctrine requires that the "employer has evidenced an intention that the particular access route or area be used by the employee," not that the area must be restricted to employee use only. *See also Bordwine,* 761 S.W.2d at 119 (reciting the same language as relied upon in *Matthews*). Furthermore, it appears abundantly clear that Ybarra parked in Casterline's parking lot as a means of getting to work. And in the absence of any evidence that Casterline objected to this practice, the Court assumes that it is undisputed that Casterline at least impliedly approved of this conduct. *Matthews,* 519 S.W.2d at 631 (stating that the access doctrine requires the express or implied consent of the employer

to pass over the access zone). Therefore, if the access doctrine applies, the Court holds that the restaurant parking lot in this case qualified as an access route under that doctrine.

■ With respect to the reasonable time issue,[6] Ybarra argues that because she waited forty-five minutes to an hour before leaving the restaurant for her car, her subsequent assault did not occur within a reasonable time as defined under the access doctrine. *See* (Def. Mary Ann Ybarra's Mot. for Summ.J.Ex. 12 at 11, 69). U.S. Fire's only response to this argument is that less than fifteen minutes passed from the time Ybarra locked the door of the restaurant and left for her car and the time that she was assaulted. (Pl.'s Resp. to Def. Mary Ann Ybarra's Mot. for Summ.J.Ex. 4 at 3–4). Without more information, the Court is unable to determine as a matter of law whether Ybarra's injury occurred within a reasonable time under the access doctrine.

In order to make the reasonable time determination, the Court must have answers to several questions. For example, was it the practice of Casterline's employees to wait as long as forty-five minutes in order to have a security escort to their car? If so, was such practice condoned or suggested by Casterline? Was the act of waiting for security before leaving considered a "job responsibility"? What were the terms of Casterline's contract with its security provider? Did such terms expressly or impliedly provide for security officers to be on the premises at closing time? The answers to these and other related fact questions will dictate whether or not Ybarra's forty-five minute wait constituted a reasonably necessary time for traveling from work. In other words, whether the wait constituted a reasonable time will depend upon the degree to which the wait was connected with Casterline (and thus the job of working for Casterline).

---

6. Looking to Ybarra's third amended petition, it is unclear from the facts alleged whether or not Ybarra's injury occurred within a reasonable margin of time for leaving work. Ybarra's third amended petition states only that Ybarra was assaulted in the parking lot while entering her automobile after she and the other employees had clocked out and closed the restaurant. (Pl.'s Mot. for Final Summ.J.Ex. A at 2). Because this Court cannot determine from Ybarra's petition whether her injury occurred within a reasonable margin of time, the Court will consider extrinsic evidence in making its decision. *See Wade,* 827 S.W.2d at 453.

Ybarra's deposition is the only summary judgment evidence brought to this Court's attention that provides any kind of glimpse into the answers to such questions. In that deposition, the following exchange occurred:

Q: Had you been instructed on leaving as a group by anybody at Wendy's?

A: No. That was just us looking after one another.

Q: Did you wait for additional security to come after you received the call from the security guard telling you that he wasn't going to be able to get there that night?

A: Yeah, we waited for a little bit.

Q: Why did you do that?

A: Because he said that he was going to try to come back. He didn't know if he was going to be able to come back when we were ready to go or not.

(Pl.'s Mot. for Final Summ.J.Ex. C–1 at 115–16).

The above testimony seems to indicate that some kind of arrangement existed in which the security officers contracted by Casterline would typically be on the premises when the employees left for the night. However, the above statement does not address all of the Court's concerns and is too vague for this Court to base its ruling upon. Therefore, the Court holds that a genuine issue of material fact exists as to the issue of whether or not Ybarra's injury occurred within a reasonable time for traveling from work.

### C. *Insured Contract Provision*

■ There is an issue in this case as to whether or not the "insured contract" provision of the policy in question serves to supersede any application of the employment exclusion. The insured contract provision provides that the employment exclusion does not apply "to liability assumed by the insured under an insured contract." (Def. Mary Ann Ybarra's Mot. for Summ.J.Ex. 3 at 1). Under the provisions of the policy, an "insured contract" can be a "lease of premises." Furthermore, under the lease of premises between Kiest, Ltd. and Casterline, the lease provides that Casterline was to provide, for the benefit of both Casterline and Kiest, Ltd., a minimum of $1,000,000 in comprehensive general liability insurance to cover claims for personal injury or death occurring on the leased premises. (Def. Mary Ann Ybarra's Mot. for Summ.J.Ex. 5(a)).

U.S. Fire argues that the Court cannot consider the lease agreement attached to Ybarra's Motion for Summary Judgment as Exhibit 5(a) because the affidavit of Scott Casterline (Exhibit 5) that purports to authenticate such lease is unsigned. However, the Court's copy of the Casterline affidavit was indeed signed, and therefore, the Court will consider the lease.

The lease, however, does not give rise to liability under the insured contract provision. That provision applies only to liability *assumed* by Ybarra under the lease. However, under none of the provisions listed by Ybarra does Casterline purport to assume any liability for Kiest, Ltd. *See* (Def. Mary Ann Ybarra's Mot. for Summ.J.Ex. 5(a) at ¶¶ 11, 13.1, 13.2). While the lease does require Casterline to secure insurance for the benefit of both Casterline and Kiest, Ltd., it does not require Casterline to hold Kiest, Ltd. harmless for any negligence on the part of Kiest, Ltd. Accordingly, the Court finds that the insured contract provision does not apply to this case and that therefore U.S. Fire's Motion for Summary Judgment with respect to any claim under the insured contract provision is GRANTED.

### IV. Conclusion

The Court hereby DENIES both of Ybarra's motions to strike; GRANTS IN PART and DENIES IN PART U.S. Fire's motion for summary judgment; and DENIES Ybarra's motion for summary judgment. At the trial on the merits, the issues considered will be limited to (1) whether the access doctrine applies in cases not involving workers' compensation insurance and (2) if it does, whether Ybarra's injury occurred within a reasonable time under the access doctrine so as to invoke the employment exclusion.

**SO ORDERED.**